Coy C. SHAW and Richard Allen
Hall, Appellants,

v.

GREATER HOUSTON TRANSPORTA-
TION COMPANY and Kenny
Hamilton, Appellees.

No. 13–89–322–CV.

Court of Appeals of Texas,
Corpus Christi.

May 10, 1990.

Rehearing Overruled June 7, 1990.

John F. Vecchio, Houston, for appellants.

Marc A. Sheiness, Hirsch, Glover, Robin-
son & Sheiness, Houston, for appellees.

Before NYE, C.J., and UTTER and
KENNEDY, JJ.

OPINION

NYE, Chief Justice.

Coy Shaw and Richard Allen Hall appeal
a jury verdict in favor of Greater Houston

Transportation Company and Kenny Hamilton, the driver of the Yellow Cab, in an automobile collision case.

This case was brought by appellants Coy Shaw (the driver) and Richard Allen Hall (the passenger) against Greater Houston Transportation Company and Kenny Hamilton (Yellow Cab) for injuries received when the truck Shaw was driving collided with a Yellow Cab driven by Hamilton. The evidence was contested on all issues, particularly damages. Shaw alleged that Hamilton unlawfully changed lanes, striking the side of Shaw's pickup. Yellow Cab asserted the accident happened when a two lane road narrowed to one lane. Hamilton, Yellow Cab's driver, was in the left lane; Shaw· was in the right lane. Ultimately, the jury found Hamilton (Yellow Cab) 70% negligent and Shaw 30% negligent. This case is an example of how a case should not be tried.

The testimony on damages was hotly contested. Shaw introduced testimony that he suffered lacerations and bruises. He had back pain which persisted. He was diagnosed as having herniated cervical and lumbar discs which culminated in a lumbar fusion and laminectomy. Hall received head lacerations and was unconscious at the scene of the accident. Expert testimony, introduced by Shaw, showed that he had suffered pain and would continue to have pain in the future. He had a 25% permanent disability. According to testimony by Shaw's physician the injuries were probably caused by this accident.

Shaw had a history of severe back problems, including a laminectomy prior to the accident. According to Yellow Cab's evidence, much of the doctor's testimony was based on the allegedly unreliable history Shaw gave. Yellow Cab cited evidence showing that Shaw had been seen by a doctor and was released as being without discomfort or disability. Yellow Cab also introduced evidence showing Shaw back at work.

The jury finally gave no damages to Shaw on each element. It awarded Hall $180.00 for past loss of earning capacity and $250.00 for past medical expenses.

Appellants raise eight points. By point one they complain that the trial court erred in coercing and unduly influencing the jury by the judge's supplemental charges, behavior and instructions during deliberations and throughout the trial. We look at this issue from two perspectives. First, were the actual supplemental charges given by the trial court coercive as that word is defined in law? Second, was the trial court's requirement that the jury continue deliberations for days and days unduly coercive?

The definitive case dealing with trial court coercion in the deliberation process is *Stevens v. Travelers Insurance Co.*, 563 S.W.2d 223 (Tex.1978). In *Stevens*, the Supreme Court held that in order to test a particular charge for coerciveness, the supplemental charge must be broken down into its particulars and analyzed for possible coercive statements. A potentially coercive statement will not invalidate the charge, unless it retains its coercive nature as a whole when all of the circumstances surrounding its rendition are considered. In analyzing any verdict where additional instructions are urged, we must balance the need for the expeditious administration of justice with the appellate court's concern for impartiality in the fact finding process. The *Stevens* court dealt solely with the coercive nature of a supplemental charge. It did not deal with the issue of the coercive effect of repeatedly returning a jury to deliberate further. Both aspects of coercion are raised in appellants' point of error.

■ Tex.R.Civ.P. 289 indicates that a jury to whom a case has been submitted may be discharged when they cannot agree and the parties consent to their discharge; or when they have been kept together for such time as to render it altogether improbable that they can agree; or when any calamity or accident may, in the opinion of the court, require it. There are not many cases under this rule from which to draw guidance. However, a few general rules have emerged from the cases which have arisen. The length of time the jury is to be held in an effort to secure an agreement is left to the sound discretion of the trial

judge. On appeal that discretion is tested. A trial judge must have considerable latitude, short of genuine prejudice to a party. There must be substantial evidence to suggest that it was altogether improbable that the jury would reach a verdict. *Conrey v. McGehee*, 473 S.W.2d 617, 620 (Tex.Civ. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.). For instance, in *Conrey*, the Court held that facts which showed that a motion for mistrial was made after 4 hours of deliberation and the jury deliberated a total of 7 hours did not present error. In *Myles v. A.J. Jackson Garbage Disposal Service*, 401 S.W.2d 723, 724-5 (Tex.Civ.App.— Waco 1966, no writ), the facts showed that the jury deliberated on Friday from 1:45 to 4:30 p.m. before recessing. On Monday, the jury resumed deliberations at 9:00 a.m. and deliberated until 4:30 p.m. On Tuesday, deliberation continued from 9:00 a.m. until 5:30 p.m. During this day, the jury asked who decides when a jury is deadlocked. There was no other indication that the jury could not agree upon a verdict. On Wednesday at 9:30 a.m., the plaintiff's attorney made a motion for mistrial. Deliberations continued until noon. The jury was returned to the jury box and the foreman announced that the jury could not reach a verdict. The court read the answers and received them as a verdict. The jury had answered the issues in such a manner that the fact that they could not reach a decision on the damage question was irrelevant. The Court of Appeals found nothing in the record which indicated that the trial court abused its discretion.

In the case at bar, the jury began its deliberations on February 2, 1988. Apparently, the jury sent a note to have testimony read back to them that same day. The statement of facts reflects that the court reporter read parts of testimony to the jury panel on many occasions. On February 3, 1988 additional testimony was read to the jury. At 12:45 p.m., the jury sent the following note:

> We are going to need some assistance or guidance from the court. We are at an *impasse*[1] regarding the percentage of

fault associated with each driver. Please advise if we have to agree on a set breakdown or if we can use a preponderance (51% = 100% negligence on special issue No. 5) of the facts to assign percentage of negligence.

There appears to be a written response from the judge suggesting that the jury read over the explanatory instructions set out at the beginning of the charge as well as Special Issue No. 5.

At 1:20 p.m., the jury sent out the following note:

> *We cannot come to an agreement* on the percentage. We have a majority of people who believe one party is over 51% negligent. We do not, however, have 10 people who can agree on a percentage over 51%. Is it lawful for jurors to compromise and come to an agreement on percentage.

Over objection, the Court sent back the following written response at 1:45 p.m.

> Yes so long as you do not violate instructions 5 and 6 in the Charge.

These questions each related to the liability issues which were submitted. At 3:25 p.m. on February 3, 1988, the jury sent out another note:

> *We cannot come to a conclusion* regarding the amounts of damages (in dollars), if any, that Mr. Shaw should receive from the accident. Please advise—is dollar amount necessary? If so, we are a *hung* jury unless you have suggestions.

This question related to the damage questions that were submitted. The court responded in writing at 3:32 p.m. that the jury should please continue deliberating.

At some point after this note was received, the trial court allowed the attorneys to each argue five additional minutes. This was after the jury had requested additional testimony recalled. The arguments ended at approximately 5:00 p.m. on February 3, 1988. The jury adjourned for the day.

At 11:00 a.m. on February 4, 1988, the jury sent out the following note:

> We are at the same impasse today as we were yesterday. We cannot get 10 peo-

---

**1.** Emphasis supplied throughout.

ple to agree on the amount of injuries (in dollars), if any, sustained by Mr. Shaw in the occurrence. *A majority of the jurors feel that further deliberation is pointless.*

At that point appellant's attorney moved for a mistrial. It is apparent that at this point the jury had deliberated on the damage issues many hours. Instead of granting a mistrial, the trial court returned the panel to the courtroom and gave the jury the following supplemental charge:

THE COURT: Ladies and gentlemen, you all have spent a lot of time working in there, and I know that you've continued to work. I think that it would be wrong to shut this trial down, now, and after you've worked so hard, and so long, and you're almost through. If you stopped now, we would have to start all over, again, with another jury, and with another trial, and all of these people's time and effort, and all of your time and effort, would have been wasted, and I realize that it's hard because each and everyone of you have worked, and you've listened, and you've worked hard. Very hard, and you've struggled, and you've really—well, I have not had a jury work as hard as you all have, and I think because each and everyone of you are the kind of people that are thinking and caring, well, that maybe you all need to give it some more thought, and if you want further testimony that will assist you in getting your job done, tell me what it is, and then Don will take the time to find it. We've come too far, and if it takes a while, let's do it.

Okay?

Whatever you need, you tell me.

Now, have you all got a lot of issues to go.

THE JUROR: Number Seven is the one we're having problems with. It's Issue Number Seven. (This was the damage issue concerning appellant Shaw). Can I tell you the problem?

THE COURT: No.

THE JUROR: Okay.

THE COURT: Well, then are you telling me that you're through with all of the others, and you have just this one to go?

THE JUROR: Yes.

THE COURT: Well, you've worked hard.

THE JUROR: Yes.

THE COURT: Getting through the other issues.

THE JUROR: Yes.

THE COURT: And, you know it's—it's frustrating, and it's hard, and we recognize that you are all twelve intelligent people, and who have been following those instructions that you got in the beginning, and that's—well, you know, that's speaking highly of you all. You've really been working, and long and hard, and you've worked really hard before on the—well, there's a question, I think, of whether or not we should go on, but I really think, and in considering how you've been working, and how you've been sitting back there and arguing, and how you've sent out notes, and which are notes that we've spent time in getting it together for you, and that I think has helped. Maybe we haven't given you exactly what you wanted, but I have to, you know, read your notes and to interpret them, and I have to keep it within the law, and the only thing that I can say is that I want you to know exactly how important that you are, and in what you're doing and do you really want to leave it up to another jury, or do you want to continue, and work it out, and to resolve this case, *and if there's any possibility that you can do that, then, I would like for you to do it. It's very important.*

If necessary, well, we will—well, I didn't give all of you a copy of the charge, but if that would help, and to give all of you a copy of the charge, and so that you can read it, and read the instructions, and if that might help, but I don't know if that would help, or not, but we sometimes give all twelve of you a copy of the charge, but I don't know. We just didn't do it.

But, you all just need to let me know what you need.

Okay?

And, you all are called the "VIP's", and because you are very important people. You are very important people to this Court, and to this country, and for what it stands for, and you, *yes, sometimes reach a point where you can't go on, but I'm not a quiter. (sic) I'm not one to throw in the towel, at all. You know that I'm "cold hearted Hannah" sometimes, and you know that I make my son come down here when he's sick, and when he shouldn't be here, and he should be in school, and I come down here when I'm sick, and because I— well, I've made you all come down here, and when you've had problems. You all have pushed me, and I've pushed you, but what I really want is to have this trial resolved as fairly as possible.*

So, if you all need to go and to rest and to relax for a couple of hours, just tell me where you want to go, and I'll send the Bailiff along with you, and you can go and relax, and you can shoot-the-bull for an hour, or so, and get away from all of this for minute, and to think about something different, and then you could come back.

Okay?

But, we understand that what you're doing is important.

Okay?

Now, if you want some more testimony, well, go back there and tell me what you want, and we'll get it. If you need some more exhibits, and you don't have all of the exhibits, well, we'll send to you what you don't already have back there.

THE JUROR: Well, can we have the deposition of the doctor?

THE COURT: Well, no you—object to this conversation in that it's an—its an improper comment to the—

THE COURT: "Mr. Vecchio," (appellant's attorney) "sit down."

MR. VECCHIO: Okay.

THE COURT: No, you can't you ____ because they were read into evidence, but they were not—

THE JUROR: They were not admitted into evidence.

THE COURT: Right.

Do you want the whole—do you want all of what was read into evidence read back to you all.

THE JUROR: *Well, no, we've had that done twice.*

THE COURT: Well anyway, I think you all know what I'm saying, and that you've got a responsibility, and I hope that you will take care of that responsibility, and that you can handle it, but I know that it's not easy. I mean, *I would invite—invite anyone of you all to come down here any day and to take my job for a couple of—well, for six months. And then, I would love to sit over there and to argue with you all for a couple of hours, you know, of for a couple of days.*

But, anyway, if you all need another pot of coffee, or cokes, or whatever, we'll send out for them, or for whatever you need. If you want to take a—well, it's nice and cold outside, and if you want to take a brisk walk outside, well, that fine with me.

But, anyway, why don't you all go back there and try it, again.

(Thereupon the jury panel was removed from the courtroom.)

At 1:45 p.m. on Thursday, February 4, 1988, the jury sent to the court the following note:

We cannot come to a decision! *Tempers are heated and people are* (getting) *frustrated. Based upon the evidence, we cannot abide by the instructions and reach a verdict. At this point, we feel the case will have to be retried.*

This note was given to the Court approximately three hours after the last supplemental charge. Thereafter, the Court called the jury back into the courtroom. The following occurred:

THE COURT: All right. Bring the jury out.

(Thereupon the jury panel was returned to the courtroom.)

THE COURT: I'm of the opinion that everybody needs a rest, and I'm going to recess the trial until Monday morning.

You all will have to come back at ten o'clock, and I'll see you all Monday morning at ten o'clock. Think about it and consider it over the weekend, and come back Monday.

THE JUROR: What?

*Why?*

THE COURT: Everybody be back here at ten o'clock Monday morning.

MR. VECCHIO: Your Honor, at this time, and in view of what the juror said, we would object to further deliberations and move for a mistrial.

The court recessed the trial until Monday morning, February 8, 1988 at 10:00 o'clock. The jury returned to deliberate as instructed by the trial court. At about 5 o'clock p.m. on Monday evening the jury reached a verdict. The jury found zero damages for Mr. Shaw and $430 damages for Mr. Hill.

In reviewing the trial court's supplemental charges to the jury, (which is previously set forth in the opinion) we look first to the individual passages of the charge as suggested by the Supreme Court in *Stevens*. The trial court's first questionable supplemental charge was as follows:

If you stopped now, we would have to start all over again, with another jury, and with another trial, and all of these people's time and effort, and all of your time and effort, would have been wasted....

This statement, standing alone, would not be coercive.

The trial court's second supplemental charge is as follows:

I want you to know exactly how important you are ... and work it out, and to resolve this case, and if *there's any possibility that you can do that, then, I would like for you to do it. It's very important.*

This statement, standing alone, may be classified as possibly coercive. A jury is aware of the position of the trial court and its power over it. The jury is aware that only the judge can allow them to end their deliberations. The court's next supplemental charge:

You are very important people to this Court, and to this country, and what it stands for ... but I'm not a quiter (sic). I'm not one to throw in the towel, at all. You know that I'm cold hearted Hannah sometimes.

This statement is potentially coercive. The Court is inferring that she is not a quitter and the jury should not quit either, until it reaches a verdict. She indicated that she was suffering personally by allowing her sick child to come to the courtroom. In other words, the trial court wanted a verdict reached by the jury.

The fourth supplemental charge to the jury is as follows:

Well, anyway, I think you all know what I'm saying, and that you've got a responsibility, and I hope that you will take care of that responsibility ...

Again, this statement appears also to be potentially coercive. It informs the jury that the Court wanted a verdict reached and believed it to be the jury's responsibility to do it.

There are three charges which clearly indicate that the trial court would not allow a hung jury. It was becoming clear that the trial court was not going to let the jury quit, because she (the judge) was not a quitter. She stated that they would have breached their responsibility in not reaching a verdict. The various disorganized "dynamite" charges as a whole were without a doubt coercive in nature. When the trial judge refused to allow the jury to cease deliberations after they had stated three times in their notes that they were deadlocked on the damage issue was, without a doubt, coercion reasonably calculated to cause the rendition of an improper verdict.

■ We find egregious the trial court's insistence that the jury continue their deliberations beyond a point in which they had affirmatively stated, "Tempers are heated and people are frustrated"—"we cannot *abide by the instruction* and reach a verdict. At this point, we feel the case will have to be retried." Even before this took place, on February 3, 1988 at 3:25 p.m., it was apparent that the jury was unable to

reach a conclusion with regard to the damage issue. On February 4 at 11:00 a.m., the jury had made no progress on the damage issue. The note stated that the jury felt further deliberation was pointless. The jury was still deadlocked after the court's supplemental "dynamite" charge. At 1:45, the jury sent another note indicating deadlock. We view it as particularly significant that the jurors stated that they could not abide by the trial court's instructions. We find it was at this point that the trial court abused its discretion by returning the jury on Monday, February 8, to deliberate further. By refusing to release the jury, the jury surely knew that it would not be released until it reached a verdict. This action was coercive in nature and was harmful error. The action of the trial judge was reasonably calculated to cause the rendition of an improper verdict. We sustain point one.

■ By their second point, appellants claim the trial court erred in not granting them a hearing under Tex.R.Civ.P. 327 on the issue of coercion and undue outside influence of the jury. This rule provides that a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, *except that a juror may testify whether any outside influence was improperly brought to bear upon any juror.* In *King v. Bauer,* 767 S.W.2d 197, 198 (Tex.App.—Corpus Christi 1989, writ denied), we held that outside influences must emanate from *outside* the jury and its deliberations. Discussion of newspaper articles, insurance coverage and improperly answered voir dire questions are not outside influence. Comments by jurors during deliberations are not considered to be outside influence. *Kendall v. Whataburger, Inc.,* 759 S.W.2d 751, 756 (Tex.App.—Houston [1st Dist.] 1988, no writ). At least one court has held that as a matter of law, jury instructions may not be considered an outside influence. *Golden v. First City National Bank,* 751 S.W.2d 639, 644 (Tex.

App.—Dallas 1988, no writ). In *Clancy v. Zale Corp.,* 705 S.W.2d 820, 829 (Tex.App.—Dallas 1987, writ ref'd n.r.e.), the Court gave examples of outside influence as an attorney tampering with evidence, or a conversation occurring between a judge and juror. In *H.E. Butt Grocery v. Paez,* 742 S.W.2d 824, 826 (Tex.App.—Corpus Christi 1987, writ denied), we held that the Court's responses to jury questions were not considered an outside influence. A juror's affidavit must be based upon knowledge and not suspicion or hope. *Lopez v. City Towing Associates, Inc.,* 754 S.W.2d 254, 259 (Tex.App.—San Antonio 1988, writ denied).

Here, appellants submitted five juror affidavits in support of their claim of outside influence. The substance of the jurors' affidavits were: that they were hopelessly deadlocked on damages; eight jurors were in favor of awarding plaintiff monetary compensation and four were not; that they believed that they would be kept there and not permitted to go home until they reached a verdict; that the Court would not permit them to be a hung jury; and they felt they must reach a decision.

These affidavits do not rise to the level of showing outside influence. As a rule, appellate courts do not permit jurors to impeach their own verdicts. However, we find these affidavits are helpful and give further support to our prior holding that the trial court abused its discretion in returning the jury time after time for further deliberations even after the jury's affirmative statement that they could no longer abide by the Court's instructions. To this extent the affidavits were relevant.

■ The jury found that the cab driver was an employee of Yellow Cab. By point seven, appellant alleges the trial court erred in granting appellee's judgment N.O.V. to the effect that the defendant cab driver was an independent contractor. To affirm a judgment notwithstanding the verdict, we must first determine that there is no evidence to support the jury's findings by reviewing the evidence in a light most favorable to the verdict, considering only the evidence and inferences which support

the verdict and rejecting evidence and inferences to the contrary. *Ortiz v. Flintkote Co.*, 761 S.W.2d 531, 534 (Tex.App.— Corpus Christi, 1988, writ denied). The parties agreed that the traditional test to determine whether a person is an employee or an independent contractor is whether Yellow Cab had the right to control or direct the work to be done. *Newspapers Inc. v. Love*, 380 S.W.2d 582, 590 (Tex. 1964). There was evidence from the defendant cab driver that he was required to fill out an application form before driving a cab. His customers were dispatched through defendant Greater Houston Transportation Company. He was required to renew his agreement to drive every 24 hours. Yellow Cab provided insurance and maintenance costs. This was some evidence both to allow submission of the issue and to support the jury's verdict. Appellees make no complaint of the sufficiency of the evidence to support the jury's answer. We hold that the trial court erred in granting the judgment notwithstanding the verdict. Appellants' seventh point is sustained.

■ By point eight, appellants argue that the trial court erred in demonstrating bias and prejudice throughout the trial. Appellants request that we take judicial notice of the findings of the State Commission on Judicial Conduct which publicly condemned the conduct of this particular trial judge, in part, for some of the activities that occurred during the trial of this case. We need not take judicial notice of the finding of the commission because there is ample error here requiring a new trial.

This case was fraught with problems and at times got out of control. Without any doubt, the trial judge violated the Code of Judicial Conduct. During the course of the trial, both the attorneys for appellants and for appellees were held in contempt. Appellees' attorney was requested to pay money to the trial court's favorite charity. This was a hospitalized friend of the trial judge awaiting an organ transplant. Both appellants' attorney and the trial court entered into numerous verbal skirmishes during the course of the trial, mostly outside the jury's presence. The trial court told appellants' attorney to "shut up!" When appellants' lawyer informed the court that he was a Board Certified lawyer with 26 years of experience, the court replied: "Well you certainly can't tell it." The appellants' attorney was required to apologize to opposing counsel and the jury for improperly requesting documents during the trial. The trial court informed Mr. Shaw that she was sorry that he had Mr. Vecchio as his attorney. At one time in the course of the trial, the judge left the bench and threatened to strike all of the pleadings in the case. At another point, appellants' attorney and the judge entered into an argument about whether or not the trial judge's child was a toddler. The trial judge brought her son, who was ill, to the courtroom for two days during the trial. This was improper and disruptive.

There were many problems and much animosity between appellants' lawyer and the trial judge. Even though many of these incidents occurred outside the presence of the jury, the cumulative effect of all of these acts deprived appellants of a fair trial. We sustain the eighth point of error.

Canon 3 A(3) of the Code of Judicial Conduct provides that a judge should be patient, dignified and courteous to lawyers, witnesses, jurors, and others with whom he or she deals in his or her official capacity and should require similar conduct of lawyers and others subject to the judge's direction and control. *See* Texas Supreme Court Code of Judicial Conduct, Canon 3, pt. A(3) (1988). Canon 3 A(2) provides that a judge should maintain order and decorum in proceedings before him or her. *See* Texas Supreme Court, Code of Judicial Conduct, Canon 3, pt. A(2) (1988). Without question, the trial judge failed to act in a manner appropriate for a member of the judiciary.

Lawyers also have the responsibility to conduct themselves with respect for the tribunal and the legal system. We pause to call attention to section IV of the recently promulgated *Texas Lawyer's Creed—A*

*Mandate For Professionalism* (Nov. 7, 1989) which says:

> Lawyers and judges owe each other respect, diligence, candor, punctuality, and protection against unjust and improper criticism and attack. Lawyers and judges are equally responsible to protect the dignity and independence of the Court and the profession.
>
> 1. I will always recognize that the position of judge is the symbol of both the judicial system and administration of justice. I will refrain from conduct that degrades this symbol.
>
> 2. I will conduct myself in court in a professional manner and demonstrate my respect for the Court and the law.
>
> 3. I will treat counsel, opposing parties, the Court, and members of the Court staff with courtesy and civility.
>
> 4. I will be punctual.
>
> 5. I will not engage in any conduct which offends the dignity and decorum of proceedings.
>
> 6. I will not knowingly misrepresent, mischaracterize, misquote or miscite facts or authorities to gain an advantage.
>
> 7. I will respect the rulings of the Court.
>
> 8. I will give the issues in controversy deliberate, impartial and studied analysis and consideration.
>
> 9. I will be considerate of the time constraints and pressures imposed upon the Court, Court staff and counsel in efforts to administer justice and resolve disputes.

This case was so flawed in the manner tried that a retrial is necessary. We REVERSE and REMAND this case to the trial court for new trial.[2]

UTTER, J., not participating.

---

**2.** Marsha Anthony, the judge who presided over the original trial of the case, no longer presides over a district court in Harris County.