

# NUMBER 13-16-00332-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

MARK A. CANTU III,                                                                      Appellant,

v.

COMMISSION FOR LAWYER DISCIPLINE,                                      Appellee.

### On appeal from the 398th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION
### Before Justices Rodriguez, Benavides, and Wittig[1]
### Memorandum Opinion by Justice Wittig

The Commission for Lawyer Discipline (Commission) brought a disciplinary action against attorney Mark A. Cantu III alleging that he committed professional misconduct during a bankruptcy proceeding involving Cantu, his wife, and a company that they controlled. The Commission alleged that Cantu failed to disclose significant assets in his

---

[1] Retired Fourteenth Court of Appeals Justice Don Wittig, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN § 74.003 (West, Westlaw through 2017 1st C.S.).

bankruptcy filings, failed to turn over assets belonging to the bankruptcy estate, interfered with the sale of estate assets, made "material false oaths," and "demonstrated a pattern of omission, obfuscation and non-compliance in violation of his obligations to the [bankruptcy] court." The Commission alleged that these actions constituted multiple violations of the Texas Disciplinary Rules of Professional Conduct. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02, 3.03(a)(1),(5), 8.04(a)(3), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A (West, Westlaw through 2017 1st C.S.). Following a jury trial where the jury concluded that Cantu had committed violations of the code, the trial court entered a judgment of disbarment. Cantu appeals this judgment on numerous grounds including, inter alia, evidentiary error, legal and factual insufficiency of the evidence, and charge error.

By several of his issues, which are dispositive, Cantu alleges that the trial court erred in allowing United States Bankruptcy Judge Marvin Isgur to testify before the jury. Under the specific circumstances of this case, we agree. Accordingly, we reverse the judgment of disbarment, and we remand this case for a new trial.

## I. STANDARD OF REVIEW FOR ADMISSION OF EVIDENCE

We review the admission or exclusion of evidence under an abuse-of-discretion standard. *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 721 (Tex. 2016); *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The erroneous admission of evidence is reversible only if it probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Brookshire Bros., Ltd.*, 438 S.W.3d at 29. The Texas Supreme Court has declined to establish any "specific test" for determining whether evidentiary error resulted in an improper judgment, but it has held that the appellate court must review the entire record, "considering the state of the evidence, the strength and weakness of the case, and the verdict." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008) (internal quotation marks and citation omitted); *see JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015); *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 73 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The issue is thus "entrusted" to "the sound discretion of the reviewing court." *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 144–45 (Tex. 2016) (citing *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009)). However, "if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Sevcik*, 267 S.W.3d at 873; *see JLG Trucking, LLC*, 466 S.W.3d at 165. And in contrast, the admission or exclusion of evidence is "likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference." *Sevcik*, 267 S.W.3d at 873; *see JLG Trucking, LLC*, 466 S.W.3d at 165.

## II. ADMISSION OF JUDICIAL TESTIMONY

Our analysis in this case is controlled by a seminal opinion rendered by the Texas Supreme Court. *See Joachim v. Chambers*, 815 S.W.2d 234 (Tex. 1991) (orig. proceeding). In that case, which concerned allegations of legal malpractice, the plaintiff moved to strike the testimony of a retired district judge who continued to serve as a judicial officer by assignment, and to prohibit any party from calling that judge as an expert witness

3

at trial.  *Id.* at 236.  The trial court denied the motion.  *Id.*  The plaintiff sought relief by mandamus.  *Id.* at 236–37.  The intermediate appellate court denied relief, however, the Texas Supreme Court conditionally granted mandamus relief and held that Canon 2 of the Texas Code of Judicial Conduct, stating that judge should avoid impropriety and appearance of impropriety, precluded the judge from testifying as an expert witness.  *Id.* at 239–40.  The relevant portions of Canon 2[2] currently provide:

> Canon 2.  Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities
>
> A.      A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> B.      A judge shall not allow any relationship to influence judicial conduct or judgment.  A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.

---

[2] Canon 2 was modified after the Texas Supreme Court decided *Joachim*.  In *Joachim*, the code provided:

> A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities
>
> A.      A judge should respect and comply with the law and should conduct himself or herself in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> B.      A judge should not allow family, social, or other relationships to influence his or her judicial conduct or judgment. A judge should not lend the prestige of his or her office to advance the private interests of himself or herself or others; nor should he or she convey or permit others to convey the impression that they are in a special position to influence him or her. A judge should not testify voluntarily in an adjudicative proceeding as a character witness.

*See Joachim v. Chambers*, 815 S.W.2d 234, 237 (Tex. 1991) (orig. proceeding) (quoting former TEX. CODE JUD. CONDUCT, Canon 2).

4

TEX. CODE JUD. CONDUCT, Canon 2, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (West, Westlaw through Dec. 1, 2017). The court noted that the principles in Canon 2 do not concern a judge's competency to testify because "a judge is competent to testify at any trial except one over which he is presiding." *Joachim*, 815 S.W.2d at 237 (citing former TEX. R. CIV. EVID. 605 and TEX. R. CRIM. EVID. 605, *see* current TEX. R. EVID. 605). Instead, the concern addressed by Canon 2 was "the propriety of a judge's testifying":

> A judge may assume the witness chair like anyone else, but he does not so easily lay aside robe and gavel. His testimony about a person's character may appear to be more than mere opinion and may be mistaken for a judicial pronouncement. Indeed, the likelihood of such misperception and the corresponding enhancement of a party's position are often the very reasons for eliciting the judge's testimony . . . .

*Id.* The court further noted that a comment to the Model Code of Judicial Conduct provided that "[t]he testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies, and may be misunderstood to be an official testimonial." *Id.* at 238 (internal citation omitted). The court also considered that the relationship that develops between a judge and the lawyer who cross-examines him may influence the judge's conduct or judgment in other cases in which the attorney must appear before the judge. *Id.* And finally, the court stated that "the appearance of a judge as a witness threatens, rather than promotes, public confidence in the integrity and impartiality of the judiciary." *Id.* (internal quotations omitted). "A judge who testifies that one party to a case does or does not have good character seems, at least, to be taking sides in the litigation," and this is "inconsistent" with the role of a judge. *Id.* The court noted that although Canon 2 specifically restricts judges only from testifying as character witnesses, the underlying principles may apply to other judicial testimony, especially expert testimony:

5

A judge who testifies as an expert witness for a private litigant provides more than evidence; the judge also confers the prestige and credibility of judicial office to that litigant's position, just as a judge who testifies to the litigant's character. Expert witnesses, unlike judges, rarely appear impartial; a party does not ordinarily call an expert whose testimony is unfavorable. An expert witness is offered to support a party's position, and if the expert is a judge, the jury may mistake that support for an official endorsement. An expert witness is usually subject to more rigorous interrogation than a character witness. Thus, the opportunity for strained relations between a judicial witness and a cross-examining attorney bent on discharging his duty to zealously represent his client is perhaps greater when the judge is testifying as an expert than as a character witness. The danger that the judge will not be able to set aside the memory of the interrogation when the attorney appears before the judge in other cases is at least as real. Even when there is no actual impropriety, the appearance of impropriety looms.

The risk of such appearance of impropriety extends beyond the particular case in which the judge testifies. Not only are jurors likely to be influenced in their decision by the testimony of a judge on one party's behalf, they will see a judge appearing to take sides. The entrance of a judge into the litigation arena in aid of a combatant impacts not only the outcome of that conflict but the very idea of judicial impartiality.

*Id.* at 238–39. Ultimately, the Texas Supreme Court held that the Texas Code of Judicial Conduct may be used to determine whether a judge should be allowed to testify in specific circumstances. *Id.* at 239. Canon 2, which is now compulsory, "provides standards which must be applied in deciding whether to allow judicial testimony." *Id.* These standards, which are invoked whenever a judge testifies, do not "categorically" prohibit judges from testifying in court. *Id.* "Certainly, a judge must, like anyone else, testify to relevant facts within his personal knowledge when summoned to do so." *Id.* The court further noted that "[i]n some circumstances, such as when no substitute for a judicial witness is available, the testimony of a judge, even as an expert, may not trespass upon the constraints of Canon 2," and in such an "unusual situation, it might be possible to minimize problems with Canon 2 by not revealing to the jury the fact that the witness is a judicial officer." *Id.*

6

Applying the foregoing principles to the facts before it, the supreme court held that the judge's testimony "confers his very considerable prestige as a judicial officer in support of defendants' position." *Id.* After discussing the acrimony of the relator's cross-examination of the judge, the supreme court noted that if "defendants are permitted to call Judge Blanton to testify before a jury, he will appear to have aligned himself with one side of this litigation." *Id.* at 239–40. The supreme court stated that the defendants should not be permitted to exploit the appearance of a judge testifying on their behalf and concluded that because there was no suggestion that the judge's testimony was irreplaceable, the defendants should choose another expert if they did not "intend to exploit Judge Blanton's credibility as an experienced judicial officer." *Id.* at 240. The court held that, under the circumstances of the case, Canon 2 prohibited defendants from calling Judge Blanton as an expert witness, and the trial court clearly abused its discretion in refusing to strike the testimony and order the defendants not to call the judge to testify at trial. *Id.* The principles announced by the supreme court in *Joachim* have been applied numerous times across the United States. *See*, *e.g.*, *Hatcher v. McBride*, 650 S.E.2d 104, 110–13 (W. Va. 2006) (collecting cases); *State v. Willis*, 811 N.E.2d 202, 218–19 (Ill. App. Ct. 2004) (same).[3]

---

[3] Texas courts following *Joachim* have struggled with the concept of allowing or requiring judges to testify. *See*, *e.g.*, *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 122–23 (Tex. 2004) (J. Hecht, concurring) ("The only person who might actually know what a trial judge would have done if a case had been presented differently is the judge himself, if his memory would serve, but he probably cannot testify voluntarily and should not be compelled." (Internal footnotes omitted)); *Neubaum v. Stanfield*, 465 S.W.3d 266, 280 n.3 (Tex. App.—Houston [14th Dist.] 2015) ("The trial judge in the Usury Lawsuit could not testify. . . . Nor could a sitting judge."), *rev'd on other grounds*, 494 S.W.3d 90 (Tex. 2016); *Orion Enters., Inc. v. Pope*, 927 S.W.2d 654, 659–60 (Tex. App.—San Antonio 1996, orig. proceeding) (concluding that a judge's affidavit addressed a question of law and was irrelevant to the issue before the court); *McDuffie v. Blassingame*, 883 S.W.2d 329, 334 (Tex. App.—Amarillo 1994, writ denied) (concluding that the trial court did not err in quashing a subpoena for a judge to testify); *Thomas v. Walker*, 860 S.W.2d 579, 582 (Tex. App.—Waco 1993, orig. proceeding) (per curiam) (concluding that the trial court did not err in quashing a subpoena absent a "threshold showing of improper conduct by a judge"); *Tate v. State*, 834 S.W.2d 566, 570 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (concluding that to compel a judge to testify regarding his or her mental processes in arriving at a decision, the movant must show extraordinary circumstances

7

### III. BANKRUPTCY JUDGE'S TESTIMONY

Here, Judge Isgur was the first witness called at trial. His testimony, in summary, comprised the following. The judge testified that he is a United States bankruptcy judge who was present in court testifying voluntarily. According to his testimony, this was the first time that he had testified in court as a United States Bankruptcy judge, and he did not take time off work to provide this testimony.

The judge testified that he was appointed to his position by the Fifth Circuit Court of Appeals, "which is the Court right below the United States Supreme Court." He gave a brief description of his education, which included a degree from the University of Houston, a masters of business administration from Stanford University, and a law degree from the University of Houston. The judge testified that he worked in business for approximately a dozen years before attending law school and practiced bankruptcy law from 1990 until his appointment to the bench in 2004. He stated that, as a bankruptcy judge, he "rules on the law, but also rules on the evidence." He compared himself to the trial court judge ("I do some of what she does, a little bit of what she does . . . .").

The judge testified that he did not preside over Cantu's main bankruptcy case, which was handled by Judge Richard Schmidt, who addressed the "routine matters." He explained that, instead, he "handled the lawsuits that arose out of [Cantu's] bankruptcy case." The judge testified that he presided over the lawsuit that resulted in Cantu's denial of discharge. During the judge's testimony, he repeatedly referred to and refreshed his recollection by reference to the opinion that he wrote in the Cantu case. The judge testified

---

and, "at the very least, a threshold showing of improper conduct on the part of the judge that would justify compelling him to testify").

that Cantu's trial encompassed two to three days of testimony, but it nevertheless took the judge two to three months to write the opinion on the case. The judge acknowledged that his opinion is seventy-two pages long and its effect was to deny Cantu the bankruptcy discharge. "This is the memorandum opinion that I issued giving the reasons why Mr. Cantu's bankruptcy discharge should be denied." The judge electronically signed the opinion, and it was "entered into the official records of the Court." The judge estimated that he only wrote fifty opinions that long in handling approximately forty to fifty thousand cases. His opinion represents his decisions about which witnesses were more credible and which documents were relevant, and his ultimate decision that Cantu's bankruptcy discharge be denied. The judge testified that Cantu appealed the decision, but then voluntarily dismissed his appeal. When asked if the decision was "binding" on Cantu, the judge testified over objection that "Yes, he is bound, and all are bound."

The judge testified that the denial of a discharge in bankruptcy is a rare event, and that he has only seen it happen approximately twelve to twenty times in his thirteen years as a bankruptcy judge. Counsel asked the judge, "What was your ruling as to why Mr. Cantu should be denied a discharge?" Over objection, the judge testified that, "[m]y ruling was that his discharge should be denied." The judge testified that the basis" for his denial of Cantu's discharge was, in relevant part, that "I found that Mr. Cantu displayed a pattern of omission, obfuscation, and noncompliance. I found under the law that he did not [sic] disregard the requirements of the Bankruptcy Code and then obtain the protection of a discharge." He continued, "I specifically found that he had given false oaths in the bankruptcy court. I found that he had improperly concealed and transferred assets that belonged to the bankruptcy case." "I found that he refused to comply with lawful court

9

orders. I found that he failed to keep adequate records as required by Section 727(a)3 of the Bankruptcy Code. I found that he withheld information from the trustee in violation of Section 727(a)4(d) of the Bankruptcy Code." "I found that in the *Mar-Rox* case he had made false oaths, that he had refused to comply with lawful court orders. I additionally found in that case he failed to keep adequate records, and I additionally found—found in that case that he improperly withheld information from the trustee." The judge further testified that he found that "each of those reasons should independently serve to deny his discharge."

During his testimony, the judge authenticated and discussed the meaning and effect of various orders that he had issued while presiding over the Cantu litigation. The judge testified that an order that he signed on September 30, 2009 "orders Mr. and Mrs. Cantu to turn over physical possession of their non-exempt property to Michael Schmidt, trustee, within five days of September 30 of 2009, and it defines what that non-exempt property is." In response to counsel's query whether it "was it the ruling of the court" that they had failed to do that, the judge testified over objection that "Yes. I found that he failed to comply with this order." The judge testified that an order that he signed on October 19, 2009, "tells [Cantu] to stop doing frivolous things" and that this order dismissed an adversary proceeding. He testified that in an order he signed on November 4, 2009, "I found that future stay violations would be treated as actions in contempt of the Court"; that "I found that [Cantu] should be required to pay sanctions for prior violations of the automatic stay"; and that "I found that . . . he should discontinue violating the automatic stay." The judge also testified that "I found that if he wished to file a judicial misconduct complaint against me, that would not violate the stay and he was free to do so."

10

The judge further testified about the attorney's fees that were incurred during the Cantu bankruptcy. According to the judge, the fees were in the hundreds of thousands of dollars, and he testified that he was not surprised by that "because Mr. Cantu's actions were the most litigious that I've ever seen in an individual bankruptcy case, and that would have dramatically driven up the expenses in the case . . . ." The judge testified that "every time that something occurred where Mr. Cantu interfered with the administration of the estate, they would have to come to court and pay legal fees to get Mr. Cantu to stop because it is expensive to prosecute a dischargeability action where you have a complex series of financial transactions that are hidden." The judge explained that when someone fails to comply with a court order, "which Mr. Cantu repeatedly did, it costs money to pay a lawyer to come and force him to comply with the Court orders. I mean, you can't do these things without expecting to drive up the legal costs."

The judge testified that he "directed that a copy of my opinion be sent to the State Bar of Texas and to the chief judge of the District Court of the Southern District of Texas." He further testified that it was his decision to send his opinion to the State Bar because the "State Bar requires a lawyer to report misconduct. I was mandated to do it by the State Bar of Texas." According to the judge, "[t]he law mandates that if we observe another lawyer engaging in activity that mandates that lawyer's disbarment or other disciplinary action, we must report it. It is not discretionary."

The judge admitted that he bore "personal ill will towards Mark Cantu," but stated that it was "[o]nly for one thing." "He disobeyed lawful orders of the Court, and I believe that I do hold some hard feelings about someone that violates orders of the Court, but

beyond that, I do not have any animosity at all to him." Over objection, when asked if Cantu had threatened to file a judicial conduct complaint against him, the judge testified that "Mr. Cantu told me that if I took certain actions, that he would file a judicial misconduct complaint against me, and, basically, I said, Go ahead." We note that the judge ultimately recused himself from the underlying bankruptcy matter.

## IV. ADMISSIBILITY ANALYSIS

We consider the foregoing testimony within the auspices of the *Joachim* analysis. *See Joachim*, 815 S.W.2d at 238. First, there is no indication in the record that the judge's testimony was necessary or that the Commission lacked a substitute for his testimony. In fact, we note that the bankruptcy trustee, Michael Schmidt, appeared at trial and certainly could have testified regarding all relevant events referenced by the judge. Accordingly, this case did not present extraordinary circumstances where the judge's testimony was necessary. *See id.*

Second, the judge was introduced to the jury as a current United States bankruptcy judge, who was apparently testifying in the course and scope of his employment given that he testified that he had not taken leave from work to appear and testify in this case. Appearing as a sitting judge acting in an official capacity, the judge conferred "the prestige and credibility of judicial office" to the Commission's position. *See id.* In providing his testimony, the judge discussed his official orders and his opinion[4] rendered in the Cantu

---

[4] By separate issues, Cantu argues that the trial court abused its discretion by admitting the judge's bankruptcy opinion into evidence. The memorandum opinion, which is seventy-two pages long, is heavily redacted but includes factual statements and legal conclusions regarding the charges at issue in this case by the very judge presiding over the bankruptcy proceeding and testifying before the jury here. We need not further address this issue here, but we note that this opinion "could be, like a judicial comment on the weight of the evidence, a form of judicial influence no less proscribed than judicial testimony." *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003). As stated by our supreme court:

12

proceedings and interpreted those orders and opinion for the jury. In this regard, we note that litigants are generally not entitled to discover the mental processes leading to judicial decisions.[5] We further note that the trial court did not provide the jury with any cautionary instructions that a judge's testimony is not entitled to greater weight merely because the witness is a judge.

Third, although the judge was presented as a fact witness, the judge's testimony primarily constituted expert opinion. As noted by the Texas Supreme Court, the demarcation between expert witnesses and lay witnesses "is not always bright." *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851 (Tex. 2011) (contrasting Texas Rules of Evidence 701 and 702). A witness is testifying as an expert witness under Rule 702 when the witness's testimony, in substance, is based on special knowledge, skill, experience, training, or education in a specific subject. *Id.* at 850. However, a witness may have special knowledge, skill, experience, training, or education in a specific subject, but testify only to matters based on personal perception and opinions, and in such a case, the witness's testimony is not expert testimony for purposes of Rule

---

"[O]ur statutes, court-made rules, and judicial decisions emphatically and repeatedly prohibit Texas judges from commenting on the weight of the evidence." A comment on the weight of the evidence may take many forms, but this Court specifically prohibits judicial comments that "indicate the opinion of the trial judge as to the verity or accuracy of the facts in inquiry." Here, the jury was permitted to see findings of fact made by the very judge presiding over the trial, and those facts were the very ones that the jury itself was being asked to find. The fact-finding present in the orders admitted as evidence comes far too close to "indicat[ing] the opinion of the trial judge as to the verity or accuracy of the facts in inquiry" for any comfort here.

*Id.* (footnotes omitted).

[5] The decisions of judges are afforded strong protection by the "mental processes rule," under which judicial or quasi-judicial officials are protected from being compelled to testify about their mental process in arriving at a decision, absent a showing of extraordinary circumstances. *See United States v. Morgan*, 313 U.S. 409, 421 (1940); *Thomas v. Walker*, 860 S.W.2d 579, 582 (Tex. App.—Waco 1993, orig. proceeding) (per curiam).

702, and the witness need not be designated or identified as an expert. *See id.; see also* TEX. R. EVID. 702. But when the main substance of the witness's testimony is based on application of the witness's specialized knowledge, skill, experience, training, or education to his familiarity with the subject of testimony, then the testimony will generally be expert testimony within the scope of Rule 702. *Reid Rd. Mun. Util. Dist. No. 2*, 337 S.W.3d at 851. A witness giving such testimony must be properly disclosed and designated as an expert, and the witness's testimony is subject to scrutiny under rules regarding experts and expert opinion. *Id.* Any other principle would allow parties to conceal expert testimony by claiming the witness is one whose opinions are merely for explaining the witness's perceptions and testimony. *Id.*

Here, the Commission had initially designated the judge as an expert witness, but de-designated him as an expert prior to trial. Nevertheless, the Commission repeatedly elicited expert testimony from the judge. The judge's initial testimony consisted of his qualifications as an expert in bankruptcy proceedings. He provided his educational background, testified about his selection by the Fifth Circuit from a large pool of candidates, and recounted having handled more than forty thousand bankruptcy cases. For all intents and purposes, the judge was presented not as a typical fact witness but as an expert witness on bankruptcy law. The judge testified regarding the "binding" effect of his opinion denying discharge and the legal effect of many of the orders he rendered during the litigation. His testimony shows that his opinion, in substance, was based on his expertise—his "knowledge, background, education and experience"—and not only his personal familiarity with the Cantu bankruptcy. *See id.* As such, and because he was not

14

proffered as an expert, the trial court abused its discretion in admitting his testimony under Rule 701. *See id.*

Fourth, the judge presented character witness testimony.[6] *See* TEX. R. EVID. 608(a) (providing, in part, that a witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character). Canon 2 provides that a "judge shall not testify voluntarily as a character witness." TEX. CODE JUD. CONDUCT, Canon 2. The judge expressly testified that his rulings and written opinion in the bankruptcy proceeding were based in part on his assessment of the credibility of the witnesses. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) (stating that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony). Before the jury, the judge testified that he "found" that Cantu "displayed a pattern of omission, obfuscation and noncompliance," "had given false oaths in the bankruptcy court," "improperly concealed and transferred assets that belonged to the bankruptcy case," "refused to comply with lawful Court orders," and "withheld information

---

[6] The dissent asserts that this issue is not presented for our review because Cantu does not argue that the judge's testimony constitutes prohibited character witness testimony. However, appellate courts liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants. *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 316 (Tex. 1999); *see* TEX. R. APP. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."); *see also Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 882 (Tex. 2017); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). Further, appellate courts consider not merely the wording of the issues but also consider the parties' arguments supporting the issues and the context of the litigation. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 863 (Tex. 2005). Here, Cantu expressly argues that the trial court abused its discretion in allowing the judge to testify. Cantu's brief asserts that "Texas law bars a judge from testifying as a character witness" and argues that "all testimony from a judge is essentially barred" because "the rule prohibiting a judge from testifying is broader than just as character witnesses." Additionally, Cantu quotes extensively from *Joachim*'s analysis regarding the prohibition against judges offering character testimony. *See generally Joachim v. Chambers*, 815 S.W.2d 234 (Tex. 1991). Moreover, Cantu's character is effectively the pivotal issue in this case. Considering the issues, the argument, and the context of the litigation, we conclude that this issue has been properly presented for our review.

from the trustee." He testified that he had instructed Cantu to stop "doing frivolous things." This is indisputably character witness testimony which is affirmatively prohibited by the code of judicial conduct.[7] This testimony is particularly noteworthy given that the judge admitted that he had personal ill will towards Cantu and that the judge had ultimately recused himself from the underlying bankruptcy proceedings. In this regard, the code of judicial conduct requires that judges discharge their judicial duties and responsibilities "without bias or prejudice." *See* TEX. CODE JUD. CONDUCT, Canon 3(b)(5), (6), (7).

We determine that, under the specific circumstances presented by this case, the admission of the judge's testimony was error.

## V. HARM

We conclude that the erroneous admission of the judge's testimony probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Brookshire Bros., Ltd.*, 438 S.W.3d at 29. We have reviewed the entire record, considering the state of the evidence, the strength and weakness of the case, and the verdict. *See Sevcik*, 267 S.W.3d at 871. Harm is patent when the first and principal witness at trial, who is presented as a sitting judge, testifies to his opinion that Cantu "displayed a pattern of omission, obfuscation and noncompliance," gave "false oaths," "improperly concealed and transferred assets," "refused to comply with lawful court orders," and "withheld information" in violation of the law. The judge's testimony was crucial to the key issues in the case as

---

[7] We note here that this testimony tracks the pleadings and the jury verdict. In its first amended original disciplinary petition, the Commission alleged that Cantu violated several Texas Disciplinary Rules of Professional Conduct, including but not limited to Rule 3.03(a)(1), stating that a lawyer shall not knowingly make a false statement of material fact or law to a tribunal, and Rule 8.04(a)(3), providing that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation. These allegations were submitted to the jury, and the jury answered affirmatively to both issues.

pleaded by the Commission and as submitted to the jury. *See id.* at 873. His testimony was not cumulative of other evidence admitted at trial and the rest of the evidence was not so one-sided that the error made no difference. *See id.* Accordingly, we hold that the trial court's admission of this testimony was reversible error, and we sustain Cantu's issues that claim error in allowing Judge Isgur to testify.[8]

## VI. CONCLUSION

Ordinarily, when reversing a trial court's judgment, we must render the judgment that the trial court should have rendered. *See* TEX. R. APP. P. 43.3. Nevertheless, we may remand a case when necessary if "the interests of justice require a remand for another trial." *See id.* R. 43.3(b); *see also Scott v. Liebman*, 404 S.W.2d 288, 294 (Tex. 1966), *abrogated in part on other grounds by Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 517 (Tex. 1978). Remand is appropriate when, for any reason, a case has not been properly developed and presented at trial. *Innovate Tech. Sols., LP v. Youngsoft, Inc.*, 418 S.W.3d 148, 153 (Tex. App.—Dallas 2013, no pet.); *Ahmed v. Ahmed*, 261 S.W.3d 190, 196 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Here, the jury heard testimony from a judicial officer which appeared to constitute an expert official testimonial in support of the Commission's position. *See Joachim*, 815 S.W.2d at 238–39. Accordingly, we conclude that this case has not been properly developed and presented, and we remand this case

---

[8] In this case, members of the jury were deadlocked for two days. Before rendering its verdict late on the second full day of deliberations, the members of the jury sent two notes to the judge stating that they had not been able to reach a decision "of at least ten out of 12 on any of the questions" and that "ten out of 12 jurors still cannot come to an agreement. The second note also states that "[w]e feel that we all cannot come to make a fair decision." Further, post-trial affidavits from the jurors, while not relevant to an "outside influence" analysis, clearly indicate that the jurors were concerned about the judge's findings and decisions. *See Shaw v. Greater Houston Transp. Co.*, 791 S.W.2d 204, 210 (Tex. App.—Corpus Christi 1990, no writ) (explaining that juror affidavits may be "helpful" and "relevant" for purposes other than outside influence).

for a new trial.  Having done so, we need not reach Cantu's remaining issues.  *See* TEX.

R. APP. P. 47.4.

DON WITTIG,
Justice


Dissenting Memorandum Opinion by Justice Benavides.

Delivered and filed the
31st day of May, 2018.

18